ALLSTATE INSURANCE COMPANY,

       Plaintiff,

                                  CASE NO. 1:07-CV-874

v.

                                  HON. ROBERT J. JONKER

TRICARE MANAGEMENT ACTIVITY, et al.,

       Defendants.

_____/

## OPINION

### INTRODUCTION

Allstate Insurance Company ("Allstate") seeks reimbursement of Michigan no-fault benefits that it claims it overpaid to Defendants Tricare Management Activity and the Department of the Air Force (collectively "Tricare" or "the Government"), and to Defendants Brian Keith Menefee, John D. Tallman, and John D. Tallman PLC (collectively, the "Tallman Defendants"). After plenary discovery, all parties filed dispositive motions. Allstate moves for summary judgment on all counts (docket # 81). Tricare moves for dismissal or summary judgment (docket # 83). The Tallman Defendants move for dismissal (docket # 85) or for summary judgment (docket # 86), and they also seek sanctions (docket # 113).

### FACTS

This action revolves around approximately $151,000 in medical bills incurred by Brian Menefee at Spectrum Health ("Spectrum") in the month following a motorcycle accident that left him with permanent, debilitating injuries. At the time of the accident, September 2, 2002,

Mr. Menefee was home on leave from the United States Air Force. (Tallman Ds' Br. in Support of Mots. to Dismiss and for Summ. J., docket ## 87-2, 91, 92-2, at 1.) Allstate was Mr. Menefee's putative no fault carrier, but Allstate initially denied coverage and refused to pay the Spectrum Health bills. (*Id.* at 2.) Tricare stepped in as Mr. Menefee's carrier of last resort, paid the bills at roughly 50% of the billed amount,[1] consistent with its contract with Spectrum Health, and provided ongoing coverage to Mr. Menefee pending the outcome of Mr. Menefee's coverage lawsuit against Allstate. (*Id.*)

Mr. Menefee and his legal guardian hired Attorney Tallman to handle the coverage dispute with Allstate. The state trial court ruled in Mr. Menefee's favor on the coverage question, and on January 16, 2004 entered a "partial judgment" against Allstate in an amount equal to the original Spectrum bills (approximately $151,586),[2] plus penalty attorney fees of $30,800. (*Id.* at 4.) The Court of Appeals dismissed Allstate's appeal from the partial judgment as premature in the absence of a final order. (*Id.* at 5.) Nevertheless, Mr. Menefee collected on the partial judgment after garnishing Allstate's bank account with Bank of America. (*Id.* at 5-6.) The cashier's checks resolving the garnishment were drawn payable to the order of Mr. Menefee and his attorney, Mr. Tallman. (*Id.* at 6.) Allstate and Mr. Menefee ultimately compromised all then remaining issues in the litigation. (*See id.* at 5-6.) Mr. Menefee filed a Satisfaction of Judgment. Allstate did not file

---

[1]The parties describe the amount Tricare paid Spectrum Health for the initial bills differently in their various motion papers, with the lowest estimate at $77,418 and the highest at $84,431. Without making a factual determination, the Court will refer to the figure as $78,000, the approximate amount Allstate seeks to recover from Tricare.

[2]The parties describe the amount of the Spectrum Health bill differently in their various motion papers. The state court identified the amount of the bill as $151,586. Without making a factual determination, Court will use that figure in referring to the Spectrum Health bill.

an appeal or any motion for relief from the final judgment. Rather, the parties notified the state court that they had reached a settlement in lieu of Allstate's appeal. (*Id.* at 7.)

Allstate now says that the $151,586 included in the partial judgment was at least implicitly earmarked by all parties and the court for payment to Spectrum Health. (Br. in Support of Pl.'s Mot. for Summ. J., docket # 82, at 6, 9, 11.) Spectrum had already received payment from Tricare for the same bills, as all parties knew at the time, but Tricare was not the proper payor and was entitled to reimbursement. (*See id.* at 5-7.) Moreover, because of Spectrum's contract with Tricare, Spectrum was able to collect on its invoices at only about a 50% realization rate from Tricare, without any right to pursue Mr. Menefee for the balance.[3] In contrast, it would be able to collect at or near 100% from Allstate, the party properly obligated to pay the bill as Mr. Menefee's no-fault carrier under the state court ruling. (*Id.*, Ex. 16.) Allstate says that Mr. Menefee and his counsel should have satisfied the Spectrum Health bill, thus allowing Spectrum to refund the original Tricare payment. (*Id.* at 12-13.) This would have left all parties whole: (1) Spectrum would have received full payment for its services; (2) Mr. Menefee would have been fully covered for his medical and other no-fault benefits; (3) Mr. Tallman would have been compensated by the court's attorney fee award of $30,800, and possibly any additional amount he was able to negotiate with Spectrum; (4) and Allstate would have properly paid the $151,586 in incurred medical expenses. (*Id.*)

Things did not work out that way. Mr. Menefee and his attorney received their payments under the partial judgment on May 7, 2004. (*Id.* at 9.) The very same day, Mr. Tallman disbursed

---

[3] Either Spectrum's contract with Tricare, or federal regulations, or perhaps both precluded balance billing to the insured. It is unclear on this record whether Spectrum's original acceptance of the Tricare payment precluded any further opportunity to collect additional money from any source once the state court determined that Allstate was liable as the no-fault carrier.

to himself the $30,800 awarded in attorney fees by the court, and an <u>additional</u> approximately $30,000, representing litigation costs and an additional attorney fee. (*See id.*) Mr. Tallman held the remaining amount in his trust account over the weekend, and then disbursed the balance to his client on Monday, May 10. (*Id.*) He did all of this before contacting Spectrum. In fact, he waited over three weeks, until June 2, to contact Spectrum. (*Id.*, Ex. 16, at 2.)

By letter of June 2, 2004, Mr. Tallman notified Spectrum that "Allstate has paid outstanding first-party benefits to Mr. Menefee, including $151,586.37 identified as 'the Spectrum bill' in the order of January 16, 2004." (*Id.*) Mr. Tallman added that he understood "that Spectrum has agreed to accept the amount paid by the United States Air Force as payment in full," and requested that Spectrum's counsel "call to confirm [Spectrum's] position." (*Id.*) Upon receiving Mr. Tallman's letter and learning that Allstate had paid off the partial judgment, Spectrum immediately notified Mr. Tallman that he was mistaken. (*Id.* at 3.) Spectrum explained that it "has always maintained, and continues to maintain, its entitlement to full payment of the incurred medical charges from Allstate," and added that "[i]n fact, Spectrum is obligated to obtain these funds and refund the [Tricare] payments per the terms of its government contracts." (*Id.*) Spectrum requested payment of "the Spectrum charges of $151,586.37" as soon as possible. (*Id.*) Spectrum also informed Mr. Tallman that it would not claim any no-fault penalties on Allstate's late payment of the claims and that it would allow Mr. Tallman "to keep all penalty interest and penalty attorney fees awarded by the Court . . . provided the paid funds are promptly paid over to the hospital." (*Id.*)

Mr. Tallman and his client did not pay Spectrum as requested. (*Id.*, Ex. 17, at ¶ 12.) On June 23, 2004, Spectrum's counsel contacted Mr. Tallman, seeking assurance that he would hold the funds in trust until a court could hear any disputes concerning the funds. (*Id.* at ¶ 13.) No assurance

was forthcoming because Mr. Tallman had already disbursed the funds to himself and his client, though neither Spectrum nor Allstate knew that at the time. On July 2, Spectrum went into the state court seeking a TRO to prevent Mr. Tallman from disbursing any funds before Spectrum could assert its claim for payment. (*Id.*, 2-17.) Mr. Tallman informed the Court that the money was already gone and suggested that Spectrum had been dilatory in seeking relief. (*Id.*, Ex. 18, at 11.) The state court denied the injunction, but repeatedly expressed surprise that Mr. Tallman had not taken care of the Spectrum bill:

> THE COURT: Well, he's [Mr. Tallman] been paid the money to pay the Spectrum bill, so I . . . kind of assumed that had already been taken care of.

> \* \* \*

> THE COURT: So, you gentlemen [Mr. Tallman][4] got the money, I don't know, a month or so ago, and a hundred and fifty-some odd thousand dollars of it was for Spectrum. So, I kind of assumed that you'd run right out and pay off Spectrum.

(*Id.* at 5, 9.) Of course, unbeknownst to anyone but Mr. Tallman and his client at the time, the money had actually been disbursed by Mr. Tallman to himself and his client on the very day it was received, or the very next business day. Mr. Tallman did not inform the Court, or anyone else, of this.

---

[4]An attorney, Robert Attmore, assisted Mr. Tallman in the initial state court action against Allstate. It appears that in speaking of "you gentlemen," in the plural, Judge Johnston was referring to Mr. Attmore in addition to Mr. Tallman. Mr. Attmore is not a party in the case before this Court. Mr. Attmore was a party in the prior state court action involving the same dispute, but the record indicates that he lacked any authority concerning the $151,586 paid to Mr. Tallman, and he is therefore not a necessary party in the case before this Court.

Spectrum took no further action to pursue collection against anyone after failing to win the TRO. Its earlier collection effort had failed too. It had originally endeavored to intervene in Mr. Menefee's coverage action against Allstate, but the trial court denied intervention, concluding that Mr. Tallman was adequately representing Spectrum's interest in receiving payment. (*Id.*, Ex. 2, at 14-17.) Spectrum then filed a new action against both Allstate and Mr. Menefee. (*Id.*, Ex. 3.) It never served Mr. Menefee, however, and Allstate persuaded the state court to grant its motion for summary disposition, arguing that Mr. Menefee, and not Allstate directly, was the proper party to receive payment if Allstate was ultimately found liable as the no-fault carrier. (*Id.* at 8-9.) Spectrum also failed to engage Mr. Tallman in effective settlement negotiations either before or after payment by Allstate of the $151,586 partial judgment.

The situation grew even messier. In 2005, Tricare billed Allstate for approximately $400,000 it had paid on behalf of Allstate's insured, Mr. Menefee, and for which Tricare claimed a right of reimbursement. (Br. in Support of Pl.'s Mot. for Summ. J., docket # 82, at 13.) Allstate paid approximately $370,000, which reflected certain adjustments to which Tricare did not object. (*Id.*) The amount demanded and paid included the $78,000 Tricare had initially paid on the $151,586 in the original Spectrum bills. Of course, Allstate had already disbursed the full $151,586 in satisfaction of the partial judgment. Allstate says it mistakenly overlooked the duplicate payment, and did not notice it until the Michigan Catastrophic Fund refused to reimburse Allstate for this amount on Allstate's claim for benefits from the fund. (*Id.* at 13-14.) Allstate tried informally and unsuccessfully to get its money back from Tricare or from Mr. Tallman. The result of all this generated entirely incongruous fundamental economic facts: (1) Allstate had advanced a total of about $230,000 on account of $151,586 in original Spectrum bills; (2) Spectrum itself had actually

received only $78,000, just over half of the amounts it properly billed; and (3) Mr. Tallman and his client had received and enjoyed the $151,586 without putting any of it toward the medical bills that were the original measure of the $151,586 partial judgment award.

This incongruity prompted Allstate to return to state court to recover some of its excess payments. In August 2006, nearly four years after the original accident, Allstate filed a new action against Mr. Tallman and his clients, rather than attempt to reopen the original coverage action. (Tallman Defs.' Br. in Support of Mots. to Dismiss and for Summ. J., docket ## 87-2, 91, 92-2, Ex. C.) The record is not clear on why it chose this route. More than a year had elapsed since entry of the agreed final judgment on that action, and this may have complicated Allstate's efforts. *See* MCR 2.612(c)(2). Moreover, Mr. Tallman and his co-counsel were not parties to the original coverage action, and Allstate may have concluded they were necessary parties on the theories of recovery asserted. But for whatever reason, Allstate elected to file a new action to pursue its objective. Allstate did not, however, join Tricare or Spectrum, the other two parties with a potential interest in the outcome.

Allstate asserted multiple theories of relief, and the state court rejected them all. (*Id.*, Ex. D, at 50-54.) Even though the state court had earlier expressed on the record surprise that Mr. Tallman had not used the proceeds of the partial judgment to satisfy any outstanding Spectrum claim, the trial court concluded that nothing in the language of the partial judgment required Mr. Tallman and his client to send the money to Spectrum or to hold it for the benefit of Spectrum. (*Id.* at 52-53.) According to the state court, each one of Allstate's asserted theories of recovery rested on the erroneous assumption that Mr. Tallman and his client had the obligation to use the money to satisfy Spectrum. (*Id.* at 50-54.) Accordingly, the Court granted the defense motion for summary

disposition. (*Id.*, Ex. D at 55 and Ex. E.) The ruling was "predominately" under MCR 2.116(c)(8), permitting dismissal for failure to state a claim, though the Court noted the defense motion under MCR 2.116(10) as well. (*Id.*, Ex. D at 43, 51.) The final order grants the motion under both sub-rules though the record discloses no history of discovery in the case. (*Id.*, Ex. E.) In addition, the court left open the possibility of an amended pleading; or, time permitting, a return to the original coverage action to clarify, reform or otherwise seek relief from the terms of the court's orders and judgment. (*Id.*, Ex. D at 56-57 and Ex. E.) The court also recognized the possibility that Allstate could pursue relief against Tricare, the recipient of Allstate's most recent payment in the case. (*Id.*, Ex. D at 55.)

Allstate did not file an amended pleading in the state case, did not seek to reopen the original coverage action, and did not seek to add Tricare to the state case. It did, however, bring a new action in federal court against Tricare. (Compl., docket # 1.) Allstate claimed it had inadvertently overpaid Tricare for the Spectrum bill it had already addressed in paying the partial judgment. (*Id.* at ¶ 16.) At the original Rule 16 conference, the Court raised on its own the concern that the case was missing parties whose joinder might well be required under Rule 19. Indeed, if Allstate were successful on its claim against Tricare, Tricare would no doubt want to recover its money from Spectrum, or from Mr. Tallman and his client. Counsel for both Allstate and the Government referred to earlier state court litigation that could complicate that joinder, but the details were not a matter of record in this Court at the time. Allstate eventually did file an Amended Complaint joining Mr. Tallman and his client. (First Am. Compl. for Reimbursement and Restitution, docket # 12.) This apparently followed an unsuccessful effort by Allstate to have Tricare implead these parties under FED. R. CIV. P. 14, which would have been an alternative way for the parties to come before the Court.

In the context of this extensive and unusual litigation history, the Court decides the parties' motions.

**ANALYSIS**

*Tricare and Department of the Air Force*

Defendants Tricare and the Department of the Air Force (collectively, "the Government") move for dismissal under FED. R. CIV. P. 12(b)(1) and 12(b)(6), asserting that the Court lacks subject matter jurisdiction over the claims against the Government, and that Allstate has failed to state a claim upon which relief can be granted (docket # 83). Allstate filed a cross-motion for summary judgment. Where a party raises a facial attack on subject matter jurisdiction, the court takes the allegations in the complaint as true. *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990); *accord*, *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004). The plaintiff bears the burden to establish subject matter jurisdiction over its claim. *Whittle v. United States*, 7 F.3d 1259, 1262 (6th Cir. 1993). Allstate has not satisfied that burden in this case. Moreover, Allstate cannot state a valid reimbursement claim against Tricare on this record.

"It long has been established . . . that the United States, as sovereign, 'is immune from suit save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'" *United States v. Testan*, 424 U.S. 392, 399 (1976) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)). This principle extends to United States agencies, which enjoy sovereign immunity except where a waiver exists. *Whittle*, 7 F.3d at 1262. Under the Tucker Act, the U.S. Court of Federal Claims has "jurisdiction to render judgment upon any claim against the United States . . . upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491.

9

Under the Little Tucker Act, the district courts have concurrent jurisdiction with the U.S. Court of Federal Claims over such claims "not exceeding $10,000 in amount." 28 U.S.C. § 1346(a)(2). The Tucker Act applies to Allstate's claim against the Government for reimbursement and vests jurisdiction in the Court of Claims. *See Brazos Electric Power Coop. v. U.S. Dept. of Agriculture*, 144 F.3d 784, 787 (Fed. Cir. 1998) (action against the United States for return of money exceeding $10,000 lies within purview of Tucker Act). Moreover, because Allstate's claim against the Government exceeds $10,000, the Court lacks concurrent jurisdiction under the Little Tucker Act. The Court of Claims is the only proper forum for Allstate's claim against Tricare.

Allstate argues that its claim is fundamentally one for equitable relief – reimbursement of a mistaken overpayment – and that this Court has jurisdiction to render the equitable relief of reimbursement, particularly if Allstate voluntarily limits its claim for reimbursement from Tricare to $10,000 or less. Indeed, Allstate says it ultimately seeks to divest Tricare of nothing, but only to use it as a conduit to reach the Tallman Defendants. The Court knows of no case law supporting this novel theory, and declines to accept it. In the first place, nothing in Allstate's Complaint or First Amended Complaint limits its claim against Tricare – however characterized – to $10,000 or less. Second, accepting Allstate's invitation to convert implied contract claims to claims for equitable relief outside the Tucker Act would flout the express language of the Act that covers both express and implied contracts. There is no exception for cases like this, in which Allstate ultimately urges that Tricare would be made whole from Spectrum or the Tallman Defendants. A waiver of sovereign immunity must be unequivocally expressed, and its scope is to be strictly construed in favor of the sovereign. *Lane v. Pena*, 518 U.S. 187, 192 (1996). *Lane* itself cites *Lehman v. Nakshian*, 453 U.S. 156, 161 (1981) for the proposition that "'limitations and conditions upon which the Government

consents to be sued must be strictly observed and exceptions thereto are not to be implied.'" *Id.* Under *Lane* and the authorities it cites, there appears very little leeway to apply the unique theory of jurisdiction urged by Allstate.

The Court would normally transfer a claim like Allstate's to the U.S. Federal Court of Claims, where subject matter jurisdiction lies, but it will not do so here because the Government is plainly entitled to judgment on the merits in this case in any event. Indeed, even Allstate ultimately recognizes that Tricare was not overpaid. Rather, Allstate asserts that Tricare received the right amount but from the wrong party. To succeed in a claim for reimbursement under Michigan common law, a plaintiff must establish that the defendant received a benefit it is inequitable for the defendant to retain. *Mich. Ed. Employees Mut. Ins. Co. v. Morris*, 596 N.W.2d 142, 151 (Mich. 1999). There is nothing inequitable about Tricare retaining the reimbursement it received from Allstate. Tricare paid bills that Allstate should have paid, stepping in as Mr. Menefee's payor of last resort while Allstate unsuccessfully contested its own obligation to pay. This created in Tricare a right of reimbursement. Moreover, Allstate was legally required to reimburse Tricare under 10 U.S.C. § 1095b and 32 C.F.R. § 199.12, which establish and implement "the statutory obligation of third-party payers to reimburse the United States the costs incurred on behalf of TRICARE beneficiaries who are also covered by the third-party payer's plan." 32 C.F.R. § 199.12. Allstate may not have intended to reimburse Tricare for the Spectrum bills after it funded the "partial judgment" referencing the same bills, but Tricare certainly had the right to recover. Moreover, as even Allstate recognizes, Tricare has not been overpaid in the matter. Allstate cannot establish a reimbursement claim on the merits. Accordingly, the Court will grant Tricare's motion for dismissal

under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) (docket # 83), and deny Allstate's cross-motion to the extent it seeks summary judgment against Tricare (docket # 81).

### Tallman Defendants

The Tallman Defendants move to dismiss Allstate's claims against them under Fed. R. Civ. P. 12(b)(6), asserting that under the *Rooker-Feldman* doctrine, the Court lacks subject matter jurisdiction over the case (docket ## 85, 91, 92-2). The Tallman Defendants also move for summary judgment on Allstate's claims against them, reiterating the *Rooker-Feldman* argument, raising issue and claim preclusion, and asserting that Allstate could not prevail under the common law of reimbursement in any event (docket ## 86, 91, 92-2). Allstate cross moves for summary judgment against the Tallman Defendants.

A.    *Rooker-Feldman*

The *Rooker-Feldman* doctrine does not apply to this case. The Court has jurisdiction over Allstate's claims against the Tallman Defendants. The *Rooker-Feldman* doctrine is a narrow principle, rooted in the understanding that "appellate jurisdiction to reverse or modify a state court judgment is lodged, initially by § 25 of the Judiciary Act of 1789, 1 Stat. 85, and now by 28 U.S.C. § 1257, exclusively in [the United States Supreme Court]." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 283 (2005). Indeed, the *Rooker* case itself was a direct attack on a state court judgment as constitutionally void. *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415-16 (1923). Noting that the *Rooker-Feldman* doctrine has been "[v]ariously interpreted in the lower courts, [and] sometimes been construed to extend far beyond the contours of the *Rooker* and *Feldman* cases," the Supreme Court has recently taken pains to confine the *Rooker-Feldman* doctrine. *See Exxon*, 544 U.S. at 283; *Lance v. Dennis*, 546 U.S. 459, 464 (2006). The *Exxon* court explicitly defines the

narrow scope of *Rooker-Feldman*, holding that the *Rooker-Feldman* doctrine is limited to "cases brought by state-court losers complaining of injuries caused by state court judgments rendered before the district court proceedings began and inviting district court review and rejection of those judgments." *Id.* at 284. Justice Stevens has even declared that in *Exxon*, the court "finally interred the so-called '*Rooker-Feldman* doctrine,'" which he described as "a doctrine that has produced nothing but mischief for 23 years." *Lance*, 546 U.S. at 468 (Stevens, J., dissenting).

*Exxon* makes clear that *Rooker-Feldman* has to be a limited doctrine, to avoid "overriding Congress' conferral of federal-court jurisdiction concurrent with jurisdiction exercised by state courts, and superseding the ordinary application of preclusion law pursuant to 28 U.S.C. § 1738." *Exxon*, 544 U.S. at 283. "*Rooker-Feldman* is not simply preclusion by another name." *Lance*, 546 U.S. at 466. *Rooker-Feldman* does not bar an independent action in federal court even if the case depends upon a ruling contrary to the state court judgment. *Exxon*, 544 U.S. at 293. The ordinary rules of issue and claim preclusion are available to address such claims.

In this case, Allstate brings a new action independent of the earlier state court case. In fact, this case began as the action the state court must have contemplated when it suggested that Allstate might pursue Tricare for the overpayment separately. After Allstate filed suit against Tricare, the case expanded to include the Tallman Defendants as necessary parties under F ED. R. C IV. P. 19. Allstate could have arrived in the same place by adding Tricare as a party defendant in the state court action – an option left open by the state court. Tricare would have removed the action, bringing the parties to the same situation ultimately reached in this case. But more fundamentally for *Rooker-Feldman* purposes, Allstate is not claiming any injury from the state court judgments themselves, but rather from the Tallman Defendants' handling of money received under the partial judgment.

*Rooker-Feldman*, as limited by the Supreme Court, does not preclude jurisdiction over such a claim. Ordinary rules of issue and claim preclusion will ensure full recognition of any applicable issue or claim preclusion.

> B.    *Merits of the Claims Against the Tallman Defendants*

The Tallman Defendants first argue that even if *Rooker-Feldman* does not apply, preclusion doctrines bar Allstate's claims against them.  In general, under claim preclusion "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 94 (1980).  In general, under issue preclusion, or collateral estoppel, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude re-litigation of the issue in a suit on a different cause of action involving a party to the first case." *Id.*  That much is easy to say, but applying the doctrines to the tangled litigation history here is anything but easy.  *See, e.g.*, *Eastern Minerals & Chemicals Co. v. Mahan*, 225 F.3d 330, 337 (3d Cir. 2000) (complex case history complicates application of preclusion doctrine).

At first glance, this case seems to beg for application of some form of preclusion.  Indeed, the trial court issued its own bench opinion denying Allstate relief on what are at the very least closely related claims to the ones Allstate brings here.  If this were all the state court litigation record revealed, perhaps issue preclusion would be enough to resolve the case.  But this is not all the state court litigation record reveals, and much of the rest of the record militates against an easy application of preclusion.

Perhaps the most obvious piece of the record that militates against preclusion is the state trial judge's obvious surprise when first confronted with the reality that the Tallman Defendants did not

use the $151,586 received under the partial judgment to satisfy the Spectrum bill. This occurred only about a month after the partial judgment entered. The matter was no doubt fresher in his mind than when he ultimately rejected Allstate's reimbursement theory about two and a half years later. When first confronted with the issue, the state trial judge stated:

> THE COURT: Well, he's [Mr. Tallman] been paid the money to pay the Spectrum bill, so I . . . kind of assumed that had already been taken care of.

> *   *   *

> THE COURT: So, you gentlemen [Mr. Tallman] got the money, I don't know, a month or so ago, and a hundred and fifty-some odd thousand dollars of it was for Spectrum. So, I kind of assumed that you'd run right out and pay off Spectrum.

(*Id.* at 5, 9.) The surprise is easy to understand because the Spectrum bill was the measure of the precise dollar amount included in the partial judgment. Moreover, the trial court had earlier refused to allow Spectrum to intervene in the coverage action leading to the partial judgment on the theory that Mr. Tallman was already protecting Spectrum's interest in the matter. One would expect that Mr. Tallman's protection of Spectrum's interest applied equally before and after collection of the partial judgment.

Of course, the state trial judge's expression of surprise, and even his earlier ruling rejecting Spectrum's intervention on the theory that Mr. Tallman was protecting Spectrum cannot erase his actual decision rejecting Allstate's reimbursement theories. But they can inform and limit the intended preclusive scope of his actual ruling. In the first place, nothing in the trial court's ruling expressed an intent to close the door on all judicial efforts Allstate might take to protect itself. To

the contrary, the Court explicitly left open the possibility of an amended complaint in the pending action, and also referenced the possibilities of reopening the judgment in the original coverage action, and of pursuing Tricare. As already noted, this action is essentially the functional equivalent of that. Second, the actual bench ruling of the trial court focused on the 2.116(c)(8) aspect of the Tallman Defendants' motion. The order entered on the ruling also included a grant under 2.116(c)(10), but the record does not reveal a full opportunity for development of the factual record, which would normally precede a 2.116(c)(10) ruling. Indeed, it was not until this action that the parties actually deposed Mr. Tallman and found out exactly what happened to the money. Finally, the partial judgment itself in the original coverage action was not a final judgment to which preclusion can apply, and the parties ultimately entered into a comprehensive settlement. Any of these factors, standing alone, undermine an easy application of preclusion. *See Norfolk Southern Corp. v. Chevron, U.S.A.*, 371 F.3d 1285, 1288 (11th Cir. 2004) (intent of parties determines scope of preclusion in context of consent judgment based on settlement agreement); *Allen v. McCurry*, 449 U.S. 90, 95 (1980) (issue preclusion "cannot apply when the party against whom the earlier decision is asserted did not have a 'full and fair' opportunity to litigate that issue in the earlier case") (citations omitted)); *Bittinger v. Tecumseh Products Co.*, 123 F. 3d 877, 880 (6th Cir. 1997) (claim preclusion applies only if there has been a final judgment on the merits) (citing *Kane v. Magna Mixer Co.*, 71 F.3d 555, 560 (6th Cir. 1995)); *Spectrum Health Continuing Care v. Bowling Irrevoc. Trust Dated June 27, 2002*, 410 F.3d 304, 310 (6th Cir. 2005) (issue preclusion cannot apply in the absence of valid, final judgment in the first proceeding, nor does it apply where a settlement is approved but particular issue party seeks to bar has not been directly litigated and decided).

Ultimately, the Court concludes it is not necessary to resolve the intricate preclusion issues because Allstate cannot establish a right to reimbursement at common law on this factual record. "[U]nder the equitable doctrine of unjust enrichment, '[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other.'" *Mich. Ed. Employees Mut. Ins. Co. v. Morris*, 460 Mich. 108, 182 (1999). A plaintiff is entitled to reimbursement only if "in light of all the circumstances, reimbursement would be equitable to defendants." *Id.* The equities of this case do not favor Allstate in a way that permits this Court to rule for Allstate. The Court does recognize the incongruity of Allstate paying approximately $230,000 on Spectrum billings of $151,586 for which Spectrum actually received only $78,000. This is not the way things should have happened in the Court's view, but the Court does not believe this record presents a basis to save Allstate from what were ultimately multiple mistakes of its own making.

In the first place, Allstate mistakenly denied coverage to Mr. Menefee. This was the original mistake that opened the door to all the rest. Second, after ultimately losing on coverage, and paying the partial judgment, Allstate went ahead and settled the entire case with Mr. Menefee without insisting on a full accounting of what happened to the $151,586 paid on the partial judgment. Allstate did not have all the relevant information, but it had enough to be wary. In particular, it knew from Spectrum's failed TRO request that Spectrum did not receive the money. Third, Allstate once again erred, in its own view, by paying the Tricare reimbursement for the same bills it thought it had satisfied under the partial judgment. Finally, the Court cannot overlook the time lapse here. The accident happened in September of 2002. The Allstate settlement with Mr. Menefee occurred in the summer of 2004. This suit did not begin until September of 2007, and the Tallman Defendants were not joined until March of 2008. After nearly four years, reliance interests are far too established to

17

permit an unwinding in favor of the party that failed to protect itself along the way.  Under these circumstances, equity cannot intervene to save Allstate from the consequences of multiple mistakes of its own making.

Accordingly, the Court will deny the Tallman Defendants motion to dismiss for lack of subject matter jurisdiction (docket # 85), grant the Tallman Defendants' motion for summary judgment (docket # 86), and deny Allstate's motion for summary judgment against the Tallman Defendants (docket # 81).

*Tallman Defendants' Motion for Sanctions*

The Tallman Defendants move for sanctions against Allstate under FED. R. CIV. P. 11; 28 U.S.C. § 1927; and through exercise of the Court's inherent authority.  Fed. R. Civ. P. 11(b) requires an attorney to conduct a reasonable inquiry before presenting a pleading, written motion or other paper to the court, to confirm, among other things, that the submission "is not being presented for any improper purpose" and that the "legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." FED. R. CIV. P. 11(b).  In determining whether Rule 11 sanctions are appropriate, a court must decide "whether the conduct for which such sanctions are sought was 'reasonable under the circumstances.'" *Salkil v. Mt. Sterling Twp. Police Dept.*, 458 F.3d 520, 528 (6th Cir. 2006) (quoting *Ridder v. City of Springfield*, 109 F.3d 288, 293 (6th Cir. 1997)).  Under 28 U.S.C. § 1927, a court may require an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously . . . to satisfy personally the excess costs, expenses and attorneys' fees reasonably incurred because of such conduct."  A district court may impose sanctions under this statute "when it determines that 'an attorney reasonably should know that a claim pursued is frivolous.'" *Salkil*,

18

458 F.3d at 532 (quoting *Ridder*, 109 F.3d at 298). The Court also has inherent authority to impose sanctions in extreme situations of bad faith or conduct tantamount to bad faith, wantonness, or deliberate oppression. *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 512, 520 (citing *Big Yank Corp. v. Liberty Mut. Fire Ins. Co.*, 125 F.3d 308, 3133 (6th Cir. 1997)). The Court finds that sanctions are not appropriate in this case under any of the theories the Tallman Defendants raise.

In judging the propriety of sanctions under any of these theories, a party's purpose is a relevant consideration. The Court finds no improper purpose in Allstate's bringing and pursuing this lawsuit. To the contrary, the basic underlying problem out of which this case arises is real. Allstate has paid out approximately $230,000 to satisfy medical bills of approximately $151,586. Spectrum, the actual service provider, has received only $78,000. Mr. Tallman and his client have received $151,586, based on the amount of the original Spectrum Health bill, but have not used those funds to pay even a portion of the Spectrum Health bill. This is not the way things should have unfolded, in the Court's view. Rather, the situation reflects a genuine and unresolved wrong. Allstate did nothing improper in attempting to recover what amounted to a windfall for the Tallman Defendants.

Of course, a proper purpose alone does not satisfy an attorney's obligations under FED. R. CIV. P. 11 or 28 U.S.C. § 1927. Objectively reasonable conduct is still necessary. *Salkil*, 458 F.3d at 528. The Tallman Defendants argue that Allstate cannot satisfy the standard because they had no reasonable prospect of success on their claims. The Tallman Defendants then catalogue the weaknesses they see in Allstate's position. However, Rule 11 motions "should not be employed . . . to test the legal sufficiency or efficacy of allegations in the pleadings . . . . Nor should Rule 11 motions be prepared to emphasize the merits of a party's position." FED. R. CIV. P. 11 1993

Amendments Advisory Committee Notes. The measure of reasonableness is not likelihood of success. The Supreme Court has even cautioned that in deciding whether to award attorney fees, district courts must "resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation." *Christianburg Garment Co. v. Equal Employment Opportunity Commission*, 434 U.S. 412, 421-22 (1978). Sanctions are not available to punish people simply for advancing arguments that are unlikely to succeed. Rather, sanctions are intended to deter baseless filings. *See Cooter & Gell*, 496 U.S. at 393. Rule 11 must "be read in light of concerns that it will . . . chill vigorous advocacy." *Id.*; *see also Riddle v. Manos*, 266 F.3d 542, 556 (6th Cir. 2001) (Clay, J., concurring) (expressing concern that award of attorney fees to defendants in civil rights action could have chilling effect on potential civil rights plaintiffs with meritorious claims). The key question is whether there exists a factual and legal basis for the contentions raised, not whether the claims are likely to succeed. Here, the Allstate claims plainly have both legal and factual basis. Indeed, the Court has rejected the Tallman Defendants' *Rooker-Feldman* claims, has doubts about the preclusion defense and recognizes a genuine and still unresolved wrong, despite ultimately ruling for the Tallman Defendants on the merits.

It is important to focus on whether the claims have any factual or legal basis, rather than on the strength of the arguments, for both theoretical and practical reasons. As a theoretical matter, the First Amendment articulates a general right to petition the government, including the courts. Litigants are entitled to a broad swath of First Amendment protection. Sanctions must not be applied to constrain novel or weak arguments that nonetheless have an arguable basis in fact and law. As a practical matter, the civil litigation system expects parties to engage in settlement negotiations

throughout the life of the case that take into account the relative strength of the parties' arguments, the economic realities of the case and the parties, and the burdens of seeking and enforcing a government-imposed outcome in the form of a litigated final judgment. In almost all civil cases, the parties will eventually find it in their best interest to make a private settlement of their differences at some point in the process. And the civil litigation system depends on that settlement incentive and dynamic both to manage the volume of civil litigation and to minimize the need for a government-imposed resolution. The normal American Rule requiring each party to bear its own attorney fees reinforces an integral part of the system of incentives.

This case illustrates the point. The parties would have been better off if they had long ago compromised. The Court is unwilling to relieve Allstate of the burden of its own mistakes by crediting any of its reimbursement theories. But the Court is also not willing to penalize Allstate's good faith assertion of losing, but supportable, arguments in its effort to correct an incongruous economic result. The Tallman Defendants have chosen to defend their receipt and retention of what amounts to a $151,586 windfall, rather than compromise along the way. There is nothing at all wrong with that, but under the American Rule, it is the Tallman Defendants who must bear the cost of that choice as long as their adversaries have acted in a good faith and objectively reasonable fashion, as Allstate has done. Accordingly, the Court will deny the Tallman Defendants' motion for sanctions (docket # 113).

## CONCLUSION

This opinion resolves all pending motions and ends the case. The Court will enter an appropriate order and a final judgment.


Dated:    September 30, 2009          /s/ Robert J. Jonker
                                      ROBERT J. JONKER
                                      UNITED STATES DISTRICT JUDGE